James D. Sanford [*Application for Admission Pro Hace Vice pending*]
GILLESPIE SANFORD LLP
4803 Gaston Ave.
Dallas, TX 75246
214.800.5111 | 214.838.0001
jim@gillespiesanford.com

Patricia E. Ronan (AZ #029009)
PATRICIA E. RONAN LAW, LLC
P.O. Box 55341
Phoenix, AZ 85078
619.458.2505
patricia@ronanesq.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| DIANNA BALABON, | Case No.: |
| Plaintiff, | |
| vs. | ORIGINAL COMPLAINT AND JURY DEMAND |
| CR OPERATING, LLC, D/B/A CANYON RANCH; CR EMPLOYMENT, INC., | |
| Defendants | |

Plaintiff Dianna Balabon complains of CR Operating, LLC's and CR Employment, Inc.'s violations of federal law forbidding sex discrimination in employment and retaliation for opposing sex discrimination.

## I.    OVERVIEW

1.    After 35-plus years under male executive leadership, Canyon Ranch hired a woman as CEO in or about March 2015. The arrival of Susan Docherty as

ORIGINAL COMPLAINT AND JURY DEMAND - 1

CEO could have marked a new era of commitment to equal-employment opportunity. Some three years later the company recruited another woman – Dianna Balabon – to lead the sales and marketing teams. Canyon Ranch hired Dianna Balabon in or about December 2018 due to her outstanding credentials and decades of experience with a range of hospitality companies. CEO Docherty made clear that she wanted and needed a leader who could "get stuff done" to help her (Docherty) "fix" Canyon Ranch.

2.     Balabon relocated to Texas in or about January 2019. She had few personal or professional connections there but was hopeful about the opportunity. Over the next six months, Canyon Ranch dashed those hopes by, first, failing to address the underlying problem that produced a work environment hostile for women – and second, refusing to address the repeated gender-discrimination concerns voiced by Balabon and other women. Balabon herself repeatedly opposed sex discrimination, on behalf of herself and advocating for women. Canyon Ranch largely ignored these women's concerns, treated male employees more favorably, and acted on impermissible sex bias and sex stereotypes.

3.     On or about June 3, 2019, Canyon Ranch terminated Balabon because of her sex and because of her efforts to oppose sex discrimination. In doing so, Canyon Ranch violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-1, *et seq*. Canyon Ranch's retaliation and discrimination inflicted significant harm on Balabon – both personally and professionally – for which she now seeks to be made whole. Worse, her termination appears to be part of a pattern of the

ORIGINAL COMPLAINT AND JURY DEMAND - 2

company favoring male employees over female employees in pay and personnel decisions. In addition to other remedies, Balabon seeks equitable relief necessary to return her to the position that she would have held absent Canyon Ranch's unlawful conduct and to protect other women at Canyon Ranch from sex discrimination and retaliation.

## II.    PARTIES

4.    Balabon is a female citizen of Las Vegas, Nevada.

5.    CR Operating, LLC d/b/a Canyon Ranch is a Delaware limited-liability company with its principal offices at 8600 Rockliff Road, Tucson, Arizona 85750. CR Operating, LLC did business in Arizona at all times material to these claims and continues to do substantial business in the State of Arizona. The causes of action asserted in this complaint arose from and are connected to purposeful acts by CR Operating, LLC and its agents during Balabon's employment. CR Operating, LLC may be served with process on its registered agent, GRB SERVICE LLC, 3507 N. Campbell Avenue, Suite 111, Tucson, AZ 85719.

6.    CR Employment, Inc. (CRE) is a Delaware corporation with its principal offices at 8600 Rockliff Road, Tucson, Arizona 85750. Canyon Ranch did business in Arizona at all times material to these claims and continues to do substantial business in the State of Arizona. The causes of action asserted in this complaint arose from and are connected to purposeful acts by CRE and its agents during Balabon's employment. CRE may be served with process on their registered

agent, Corporation Services Company, 8825 N. 23d Ave., Suite 100, Phoenix, AZ 85021.

7.      When Balabon alleges that CR Operating, LLC and CRE committed any act or omission, she means that their officers, directors, principals, vice-principals, agents, servants, and/or employees committed the act or omission and that their officer, director, principal, vice-principal, agent, servant, and/or employee committed the act or omission in the course and scope of his or her employment and with their full authorization, ratification, and/or approval.

### III.      JURISDICTION AND VENUE

8.      This court has original jurisdiction to hear the merits of Balabon's claims under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §2000e-5(f).

9.      CR Operating, LLC and CR Employment, Inc., individually and together, do substantial business in this district and division and are subject to personal jurisdiction here. A substantial portion of the acts and omissions leading to Balabon's claims – including decisions about the unlawful termination – occurred at their headquarters, located in this district and division at 8600 Rockliff Road, Tucson, Arizona 85750. Canyon Ranch's management, Human Resources functions, and most other administrative offices are located at that address, as are employment records relating to Balabon and other employees. The earnings statements that Canyon Ranch issued to Balabon during her employment listed CR Employment, Inc. at the 8600 E. Rockcliff, Tucson, Arizona 85750 address. Venue is therefore proper in this district and division under 28 U.S.C. § 1391 and 42 U.S.C. §2000e-5(f).

ORIGINAL COMPLAINT AND JURY DEMAND - 4

### IV.    FACTUAL BACKGROUND

**A.    Canyon Ranch's Duty to Maintain a Discrimination-Free Workplace**

10.    Canyon Ranch comprises multiple entities, all under common management and control, including CRE and CR Operating, LLC (together, "Defendants" or "Canyon Ranch"). Founded in 1979, Canyon Ranch styles itself as a luxury wellness lifestyle brand operating day spas, health spa resorts, and a wellness retreat. Canyon Ranch has its headquarters at the resort outside Tucson, Arizona (8600 E. Rockliff Road, Tucson, AZ 85750). Canyon Ranch's revenues in 2018 exceeded $36 million.

11.    CR Operating, LLC and CRE were at all relevant times – and are now – each an "employer" under Title VII. *See* 42 U.S.C. § 2000e(b).

12.    CR Operating, LLC and CRE are an integrated enterprise, or alternatively, they were Balabon's joint employer. They are jointly and severally liable for Balabon's claims.

13.    At all relevant times Canyon Ranch was aware of its duties under federal and state law to prevent and remedy discrimination in the workplace. For a company with a clientele that is over 70 percent female, and in the context of broader social conversations over sexual harassment and sex discrimination, by or about 2019, Canyon Ranch should have been fully conscious of the risks of gender bias in its workplace. Reflecting this understanding, Canyon Ranch declared to the United States Equal Employment Opportunity Commission that it was "committed to providing a work environment free from discrimination and harassment, including

on the basis of gender/sex." Canyon Ranch also contended to the EEOC that it prohibits retaliation against staff members, who "in good faith, participate[] in the reporting or investigation of a complaint of any kind of [discrimination] ...."[1]

14.    For most of the company's history, Canyon Ranch's executive leadership and upper management has been (and remains today) predominantly male. After 35 years under male leadership, Canyon Ranch hired its first female chief executive officer, Susan Docherty, in or about March 2015. The nominal reason the company selected Docherty was because she offered leadership with a deep history of brand marketing and experience building iconic brands relevant to multiple generations. Although a promising first step, hiring Docherty was not alone sufficient to unravel the decades of male-dominated perspective governing Canyon Ranch's workplace. On information and belief, Canyon Ranch did little else to address negative gender stereotypes about the role of women in its workplace.

15.    Canyon Ranch prides itself on offering its clientele mind-body wellness in a relaxed setting of casual elegance. Its professed aim is to "inspire people to make a commitment to healthy living, turning hopes and intentions into the highest enjoyment of life."[2] Canyon Ranch's pattern of ignoring the risks of double standards and gender stereotypes affecting women, and of mistreating female employees –

---

[1] *See* CANYON RANCH STAFF GUIDEBOOK at 23-24.

[2] *See* OVERVIEW (available at: https://www.canyonranch.com/about-us/).

especially when compared to their male counterparts – shows that this commitment does not extend to its workplace.

16.     For years prior and increasingly since January 2019, Canyon Ranch's employment practices show a pattern of sex discrimination. This pattern is reflected in the company paying well-qualified and high-performing women significantly less than male peers. Women who speak up about the differential treatment meet with the indifference of Human Resources and leadership – or worse – suffer retaliation. The result of this gendered work environment and the accompanying double standards has been, among others, women feeling held back and like second-class employees, and that a substantial majority of those discharged or laid off by Canyon Ranch in the past two years, alone, have been women (several of whom the company replaced with men).

**B.    Canyon Ranch Recruits Balabon to Lead its Sales and Marketing Efforts**

17.     Canyon Ranch continued to execute on its strategic plan to build its brand under Docherty's leadership into or through 2018. In or about November 2018, Canyon Ranch developed and recruited a new position, Senior Vice President – Sales and Marketing (SVP), which was to oversee "strategic development, direction, and implementation of all Sales and Marketing activities for the company." The new SVP was to report to Canyon Ranch's then-President and Chief Operating Officer, Tom Klein. The SVP would lead approximately 50 employees across the Marketing,

Digital Marketing, Sales, and Public Relations teams (split between the Tucson and Ft. Worth offices).

18.    In or about early November 2018, a recruiter working on Canyon Ranch's behalf contacted Dianna L. Balabon about the position. Balabon had about two decades of experience working with some of the most respected luxury and lifestyle brands. She specializes in all aspects of brand building; brand positioning; digital, traditional, and emerging media strategies; public relations; web-development; CRM; team building; and global sales. In her decades of experience, Balabon has navigated all varieties of workplace, collaborated with all manner of personalities, worked for and with countless leadership styles, and managed countless employees. Balabon had strong credentials and a solid industry reputation.

19.    President/COO Klein contacted Balabon on or about December 8, 2018 about the opportunity with Canyon Ranch. Canyon Ranch's executive leadership interviewed Balabon in multiple meetings and calls over the next month. CEO Docherty, President Klein, Chief People Office (CPO) Phil Norman outlined the key professional priorities of the SVP position and detailed the personnel reporting to it. All reiterated what was express in the position description: the four Vice Presidents (Sales, Marketing, Digital Marketing, and Public Relations) would report up to the SVP. CEO Docherty explained that she expected Balabon to lead the Center of Excellence, a grouping of the company's marketing, sales, revenue, and digital functions. Docherty let it be known – in a sentiment that she would repeat over the coming months – that she had been trying to "fix" Canyon Ranch and that she could

ORIGINAL COMPLAINT AND JURY DEMAND - 8

only get that done with strong marketing leadership ("I need someone who can get stuff done.") The SVP role was vital to Docherty's plan for the future of Canyon Ranch, and Docherty saw Balabon as a fit for this role.

20.   CPO Phil Norman officially offered the position on or around December 20, 2018.

21.   An early red flag that she was joining a gender-biased work environment was that Canyon Ranch's initial compensation offer to Balabon did not reflect the stature or responsibilities assigned to this position. The initial salary offer was less than the salary of the Vice President of Digital Innovation (Kerry Kennedy (male)). Over the next week of discussions, Balabon, Klein, and Norman negotiated additional salary compensation more in line with the Senior Vice President's position in the company hierarchy.

22.   Canyon Ranch professes to be an equal-employment opportunity employer and to value its employees. But in practice the company places little emphasis on anti-discrimination laws and equal-employment-opportunity policies. Training on non-discrimination and non-retaliation practices and protections is minimal, and this lack of emphasis filters down to employment decisions.

23.   Balabon's official start date was not until the latter part of January 2019. In the meantime, she had to return to her home in Las Vegas, Nevada, and arrange the move to Texas. While still with family over the Christmas holiday, Norman relayed Klein's request to attend "really important meetings" on or about January 3-4, 2019 in Tucson, Arizona. Norman said that they could not pay Balabon

ORIGINAL COMPLAINT AND JURY DEMAND - 9

to attend those meetings but that it would be "great if [she] could." Enthusiastic about the opportunity, Balabon agreed to travel to Arizona for the meetings even ahead of her start date.

24.    The Canyon Ranch job required Balabon to pack up her life in Las Vegas and relocate to Ft. Worth, Texas, where she had no professional ties and few personal connections. Balabon took out a lease on a rental home and subscribed to all the utilities and public services necessary to set up a new household. The Canyon Ranch position was a significant impact on her life and career, but Balabon believed the job presented an opportunity for professional enhancement and to contribute to the promised growth and development of the Canyon Ranch brand.

25.    On or about January 23, 2019, Canyon Ranch issued a press release in industry press announcing Balabon's hire. According to the announcement, Balabon would "direct all sales and marketing efforts throughout the enterprise and guide the efforts of [the sales and marketing] teams."[3]

26.    Balabon's first official workday was on or about January 28, 2019. Almost immediately Balabon observed how the work environment favored male employees and disadvantage women. Over the next four months Balabon repeatedly

---

[3] *E.g.*, Karantzavelou, Vicky, CANYON RANCH ANNOUNCED THREE NEW SENIOR LEADERSHIP HIRES FOR THE ICONIC BRAND AND TUCSON WELLNESS RESORT, TRAVEL DAILY NEWS (Jan. 23, 2019)(available at: https://www.traveldailynews.com/post/canyon-ranch-announces-three-new-senior-leadership-hires-for-the-iconic-brand-and-tucson-wellness-resort).

ORIGINAL COMPLAINT AND JURY DEMAND - 10

warned management about the gender-biased environment. Despite her warnings, executive management and Human Resources dismissed, ignored, and failed to address the concerns.

27.    On or about January 28, 2019, Balabon attended "meet and greet" orientation meetings with her Texas-based staff. The meetings were meant to be a broad introduction to ways of working, an introduction to team members, and a discussion of key information to facilitate later in-depth meetings. To Balabon's surprise, as an incoming senior executive heading up a new Sales/Marketing organization and the company's Center for Excellence, the company's owner, John Goff, did not meet with Balabon when she arrived or at any other time. This was another red flag for potential gender discrimination as, by comparison, Goff had monthly meetings with lower-level (Vice President-level) men.

28.    The last meeting of this first day was with the digital marketing/digital innovation team and its Vice President, Kerry Kennedy (male). The Vice President of Marketing, Michele Smith, and a digital manager attended parts of this meeting. During what was supposed to be an introductory meeting, Kennedy grew furious, shouted at Balabon, and alarmed Balabon and others in the meeting. When the digital manager left the room, Kennedy continued to shout at Balabon showing blatant disrespect for a female leader (and his nominal direct supervisor). Balabon was shocked by his oddly hostile, unprofessional, and unprovoked behavior.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C.   Canyon Ranch Overlooks the Hostility and Prejudice Against Women Displayed by a Male Employee After Balabon Reports the Hostile Environment to Company Leadership**

29.   Shortly after Kennedy's unprofessional outburst in the January 28 meet-and-greet, Balabon reported Kennedy's hostility – and what, under the circumstances, should have been seen as direct insubordination – to President Klein. Balabon said that Kennedy exhibited an unusual level of anger and aggressiveness unlike "anything [she had] ever experienced" which "scared [her]." To her surprise, Klein simply shrugged off both Kennedy's unprofessional behavior and the insubordination. This was yet another red flag for discrimination: not mere gender bias, but open hostility by a male employee to a female leader and company leadership's support for that employee. Despite Balabon's report, and a similar report by a witness, Klein gave Kennedy the benefit of the doubt, minimized the situation ("Millennials these days"), and put the burden on Balabon to fix the problem ("Try to make it work.").

30.   Canyon Ranch claims to be proactive in providing a work environment free from gender/sex discrimination. The company is – and was in or about 2019 – aware of its duty under state and federal law to prevent and remedy sex discrimination in its workplace. Klein's dismissive and forgiving response to a male employee's unprofessional and provocative outburst toward a woman executive leader was a sign of the company's indifference and inaction in the face of sex-biased hostility to come. Canyon Ranch excused the insubordinate outburst of this favored male employee, and on information and belief, Kennedy was neither counseled nor

ORIGINAL COMPLAINT AND JURY DEMAND - 12

disciplined for his misconduct. Canyon Ranch apparently took no meaningful steps to address the situation. Worse, although formally naming Balabon in charge of Sales and Marketing, the authority given her was illusory. Canyon Ranch leadership failed to support a woman leader even as it defended and deferred to her nominal subordinate.

**D.    Canyon Ranch Abandons its Commitment to a Discrimination-Free Workplace and Violates its Duty to Prevent and Remedy Sex Discrimination**

31.    By ignoring Balabon's first report, Klein and Canyon Ranch leadership allowed the gendered hostile environment to fester. In or about mid-April 2019, Smith (female) approached Balabon to report concerns about Kennedy's ongoing hostility and unprofessional behavior (e.g., calling Smith "incompetent"). This devaluation of a woman's ability and/or intelligence – despite objective facts showing her to be capable and highly competent – should have been a clear indication of gender bias, even outright sexism, on Kennedy's part.

32.    Smith further shared that the women on Balabon's team were suffering and enduring a hostile work environment caused by Kennedy and by the company's inaction toward him. Smith's complaint was consistent with Balabon's experience in reporting Kennedy's early insubordination and Klein's dismissive – almost protective – attitude toward him.

33.    After hearing Smith's concerns, reflecting similar concerns from other women, Balabon felt she had to speak up for her team and that company leadership needed to know about the situation. Balabon decided to speak with President Klein

and CPO Norman. Norman's initial response to Balabon's protected activity was to instruct Balabon's team (through Balabon) to put their concerns in writing directly to him for review.

34.    Balabon at first took this request as a legitimate effort by Norman to investigate gender hostility and discrimination. In response, as further protected activity, she asked the women on her team to submit their concerns to CPO Norman.

35.    On information and belief, Canyon Ranch did not take meaningful action in the face of Balabon's reports. Other than perfunctory meetings with Balabon, Smith, and others, there was no formal investigation, Kennedy received only the mildest counseling (by email), and the company required him to undergo no additional training.

36.    Balabon asked the women on her team to submit their concerns to CPO Norman. On information and belief, the four women all reported Kennedy's hostility to Norman in or about the first week of May 2019. Smith's complaint (on which she copied Balabon) described the "toxicity and negativity" that her male co-worker "has brought to the company," which was "compounded by his explosive rage and uncontrolled temper." Smith reported that he was a "ticking time bomb" and pleaded that, "for me and my team to do our jobs, the harassment, hostility and intimidation must be stopped." Smith's report documented the harm to the terms, conditions, and privileges of employment that the biased atmosphere was causing. Smith's report ended noting that "emails from [her] direct reports [had] been sent directly" to Norman. Alone and in combination with Balabon's earlier reports and the concerns

ORIGINAL COMPLAINT AND JURY DEMAND - 14

other women (both in Tucson and Ft. Worth), Canyon Ranch knew or should have known that Kennedy was biased against his female co-workers and superiors, and that there was a risk of a gendered hostile work environment at its corporate offices.

37.    Canyon Ranch's failure to take seriously the complaints of these women did not inspire confidence or hope for an improved situation. On or about May 6, 2019, Norman's "investigation" was to meet briefly with Balabon and Smith. He then met separately with Smith, who reiterated the information from her written complaint and concerns over workplace bias. Canyon Ranch's top Human Resources person appeared not to take the complaint seriously and/or to being acting to defend Kennedy. He toned down and recast the report in a more favorable light (to the company and the male co-worker) and discouraged Smith from pursuing a "formal" complaint.

38.    Afterward, Norman met again with Balabon. During this meeting it appeared that Norman was more frustrated with having to spend time examining the situation than taking the concerns seriously. He not only dismissed Smith's concerns but did so with gendered terminology ("Michele has always been a bit uppity with me…."). It was highly concerning that the head of Human Resources was not only overlooking open hostility and discrimination complaints but was dismissing a woman's reported concerns based on stereotypes about women appearing "uppity" when they simply dare to question inappropriate male behavior.

39.    Norman also gave no indication of any corrective measures that would follow, but instead leaned in the direction of retaliation by "wagging [his] finger at"

ORIGINAL COMPLAINT AND JURY DEMAND - 15

Balabon for a strong email that she had sent attempting to show solidarity with and encouragement for her team-members. It is unknown whether Norman bothered to "wag his finger" at Kennedy for offensive, insubordinate, and – increasingly – openly sexist attitudes.

40.     Norman's dismissive response left Balabon feeling that the company was not taking any of the women's concerns seriously. Around this time, Balabon shared her concerns and the complaints of the women on her team with President Klein and CEO Docherty, but with little more response. Klein met with Balabon to discuss the reporting structure, explaining that the Executive Committee had decided that the Vice President of Digital Innovation, *i.e.*, Kennedy, would finally report to Balabon (consistent with earlier commitments and the position description). Balabon responded that "[Kennedy] will resign," that he disliked Balabon, and that "he does not like women." Oddly, neither Klein nor Docherty responded to this report asking what Balabon meant or indicating any need or interest to examine Kennedy's views or actions toward women.

41.     Klein simply said that he was confident that Balabon would make it work, again transferring the full burden of Kennedy's issues with women and the resulting hostility onto her shoulders. Balabon committed to do her best to make it work, to turn the page, and to get right to work. On or about that afternoon or the next day, Klein let Balabon know that he had refused Kennedy's resignation (offered when told to report to Balabon), a sign once again of not only an effort to protect but even deference to a disgruntled male employee.

42.     Klein gave no indication that Canyon Ranch intended to take any corrective action or impose any discipline on Kennedy. By this point, Kennedy had engaged in open hostility, emotional outbursts, and insubordination. He was named in additional complaints by other women and was identified as having issues with women. Under any fair measure, he should have been terminated – and yet Canyon Ranch would not even accept his resignation when offered (repeatedly). These circumstances when not met with any real consequences only empowered Kennedy and his animus toward Balabon. Balabon observed no consequences for documented insubordination and/or misogyny for this male employee at any point in her employment.

43.     On or about May 6, 2019, Klein instructed Balabon to give Vice President Sales Denise Bruzzone her annual performance review. In yet another red flag of gendered stereotypes, Klein told Balabon that he considered Bruzzone "too emotional" and "not strategic enough." Klein directed Balabon to deliver this message as part of the review. Balabon had not observed Bruzzone being either "too emotional" or lacking strategic thinking, and the assessment was at odds with Bruzzone's professional resume and her track record with Canyon Ranch. Klein did not say that he viewed Kennedy – despite his recent emotional outburst – or any other male executive, for that matter, as overly emotional or lacking in strategic outlook.

44.     By this point, Balabon had seen that both her boss (Klein) and the company's human-resources leader were protective of a male colleague exhibiting

ORIGINAL COMPLAINT AND JURY DEMAND - 17

objectively offensive behavior that should have warranted substantial corrective action. She had heard them both express views of women's motives or performance reflecting gender stereotypes – a woman being "uppity" or emotional, or lacking "strategic thinking" – when she knew that those women exhibited none of those traits.

45.    Consistent with these double standards, on or about May 8, 2019, Klein again demonstrated his deference toward and patience with Kennedy's behavior. Clearly, Kennedy was at best reluctant and at work openly hostile to being part of a team led by a woman. Instead of being direct about his obligation to fall in line, Klein asked Balabon to "see if [she] could bring him around." Compelled by her work ethic and character, but despite her reservations and the company's failure to support her, Balabon again attempted – unsuccessfully – to break through Kennedy's personal issues with women.

46.    Later on or about May 8, 2019, Balabon met with CEO Docherty to discuss the hostile environment, among other things. Docherty suggested that "Kerry is going to be a handful for you to manage." Balabon again directly pointed to gender as the problem:  she said, "He's a misogynist" and that he had a particular distaste for Balabon and Smith. Once again, she committed to do her best under the circumstances. In response to this further protected activity, Docherty – who should have had the power to address the situation – gave no indication of corrective measures to follow. Instead, she hugged Balabon, saying "I'm so glad you are here. Please tell me you aren't going to leave us."

47.     Over the next several weeks, neither Kennedy's behavior nor the hostile environment improved. He often did not show up to the office for work and did not let Balabon know where he was. He was a no-show on an important conference call and declined at the last-minute to attend another important meeting for a new resort. Kennedy's worsening behavior was disruptive and interfered with the Sales and Marketing team's work. However, Balabon observed no discipline, counseling, or corrective action directed at Kennedy by Klein or Norman, although she kept them informed. Although Canyon Ranch continued to task Balabon with managing aspects of Kennedy's employment, leadership withheld actual authority to discipline Kennedy or to take steps to replace him so that Balabon could build a unified and productive team that could positively impact Canyon Ranch. Instead, Canyon Ranch consistently demonstrated that Kennedy's behavior, insubordination, and mistreatment of women co-workers would be tolerated.

48.     On or about May 13, 2019, Kennedy finally responded to Balabon's efforts to speak with him. As she asked for the hand-over report, he said he still had not decided if he was "going to stay" and that he "d[id]n't need this job." He then warned that, "If I do stay, and I get one wrong look from you, or one wrong look from Michelle, I'm out of here."

49.     After this inconclusive meeting with Kennedy, Balabon returned to Klein's office to brief him about the untenable situation. Klein acknowledged that Canyon Ranch was putting her in a terrible position and said that he would finally accept Kennedy's (repeatedly offered) resignation. Despite it all, Klein again

revealed his preference for the male subordinate, saying "I have a lot of time for Kerry," and even indicating that he might hire him as a consultant.

50.     In or about that same week, Klein told Balabon that he and Norman had spoken to Kerry, who again attempted to resign rather than report to Balabon. Klein said that they had (finally) accepted his resignation. At Klein's direction, Balabon attempted to arrange for a "hand-over" meeting with her male subordinate so that he could transfer client contact information, update her on project statuses, and generally update her on his work. Kennedy was – at best – resistant when he bothered to respond at all (to his supervisor).

51.     Klein's continued deference toward and protection of this male subordinate mirrored the earlier decision to try to pay Kennedy more than Balabon. From all appearances, both Klein and Norman overvalued Kennedy, exaggerating his actual performance and "potential," while ignoring his clear insubordination and hostility toward women.

52.     Canyon Ranch's enabling of Kennedy's gender bias and its refusal to address and remedy the hostile and sex-biased environment culminated in another outrageous attack on Balabon on or about May 28, 2019. Balabon met with Kennedy and a project manager in the third-floor conference room. As the meeting ended, Balabon (again) asked for Kennedy's the hand-over report. Kennedy's wholly unprofessional response was to shout at Balabon: "This *is* the hand-over!" He stormed out yelling "You wanted it. It's all yours, Baby!" over and over. Shocked at this hostility and aggressive display and stung by the sexist and demeaning taunts,

ORIGINAL COMPLAINT AND JURY DEMAND - 20

Balabon waited for Kennedy to get on the elevator before leaving for the fourth-floor offices.

53.     As a senior company leader, Balabon should never have had to deal with the January outburst nor with his ongoing disrespect. Canyon Ranch should have backed her up with the authority to address the open insubordination and unprofessional conduct by a Canyon Ranch employee. Canyon Ranch failed again when Balabon went to Kennedy's office to caution him (with apparent frustration), "Don't ever call me Baby." Kennedy shot back menacingly (but falsely), "Don't come into my office with that tone and tell me what to do. I don't report to you." He stood up, his face red and distorted, and got into her face. He shoved his phone in her face, saying that he was going to record the conversation. Balabon again asked for the hand-over status report, which further enraged him. He went to the middle of office floor screaming about Balabon and slandering her as "toxic," among other names. Smith, who thought Kennedy was preparing to hit Balabon, came out of her office. Seeing Smith, Kennedy threatened her ("You're next!").

54.     Recognizing that he had no respect for her authority, Balabon returned to her office where she texted Klein for help. Klein and Norman called soon after from Tucson. Balabon reported the situation and restated her concerns. Klein and Norman, as Canyon Ranch's senior leaders, should have demonstrated their commitment to remedying the hostile situation. Instead, they merely encouraged Balabon to "take a walk." Klein and Norman once again opted for half-hearted gestures over swift and firm corrective action.

ORIGINAL COMPLAINT AND JURY DEMAND - 21

55.     On or about May 30, 2019, Balabon returned to the office for a global wellness conference that she had organized with the Canyon Ranch teams in Tucson and Lenox, Massachusetts. As the conference concluded, two of the attendees said on a conference call with Klein, Balabon, and others that this was "the best meeting [that they had] attended at Canyon Ranch in 15 years." They added that "Diana is brilliant."

56.     After the conference ended, on or about Friday, May 31, Balabon returned a message from Norman. Norman's reaction was stunning. He lectured Balabon (again "wag[ging] [his] finger at her). Although Balabon had retreated and sought help, Norman – trading on timeworn stereotypes – blamed her for not "de-escalating" Kennedy's outburst.

57.     Norman's criticism was now clear evidence of his own bias and sex discrimination. He simply refused to place any blame on a problematic and insubordinate male employee. Instead, without evidence, he assumed the woman was to blame and somehow responsible for the man's inappropriate behavior. He evidently saw Kennedy's anger as justified and/or Balabon's mere exercise of her authority (even in a mild and diplomatic way) as improper.

58.     Shocked by his response, Balabon asked Norman what he would have done in the situation, but he could not or would not answer. Instead, he said, "I don't know" and then recounted the story of a woman he once worked with whom he disliked ("I couldn't stand her.") Norman's implied advice was to learn to ignore misconduct when it came from men, even when it interfered with her and other's

ORIGINAL COMPLAINT AND JURY DEMAND - 22

ability to do their job for the company. Among other parts of the discussion, Norman defended Kennedy and lamented his departure ("he would have done great things"). This view of Kennedy's "potential" as something of value – when that was doubtful – while ignoring the value or potential of the women subjected to his hostility was yet another indicator not merely of bias but of stereotyped and sexist views of women.

59.    In response, Balabon returned the conversation to the crux of the problem: an unprofessional subordinate engaged in misogynistic behavior, including inappropriate (and sexist) taunts like "Baby" to refer to Balabon. Norman indicated no corrective action or further investigation; instead, he said he would have to think about it.

### E.    Canyon Ranch Terminates Balabon Over Her Efforts to Prevent Sex Discrimination

60.    On or about Monday, June 3, 2019, while preparing for a meeting with the Executive Committee, Norman surprised Balabon by showing up in person around 10 a.m. to her office. He said that the company was terminating her employment. He said that, "[a]s a senior executive, [she] should've de-escalated" the situation during Kennedy's outburst. Balabon was utterly shocked. She asked if the decision was final. Norman said it was ("This is decided.") He then escorted her out of the Canyon Ranch offices asking only if she "wanted the flower" that was on her desk.

61.    On or about June 3, 2019, Balabon texted Klein asking for the courtesy of an explanation for her termination. The next morning Klein and Norman called

Balabon from Tucson, Arizona. When asked how the company decided to terminate Balabon, Klein simply said that "as a senior executive," Balabon should have walked away from Kennedy. Klein blamed her for "ma[king the confrontation] public." Klein and Norman acknowledged that Kennedy had started things. They said that the company "just can't have that kind of outburst," even though they had tolerated Kennedy's previous outbursts for months and largely ignored the complaints of sex-biased hostility from Balabon and other women. Despite her request, Canyon Ranch failed and refused to investigate the situation. Balabon asked Norman to obtain the recording that Kennedy appeared to make during his outburst. Uninterested in learning the truth of what happened, Norman refused on the pretext that he could not ask for the recording due to "property rights."

62.    The termination – following so close on the heels of the public aggression by her subordinate – devastated Balabon. She had never experienced such stress and mismanagement in her professional career, spanning almost 30 years. She was immediately overcome with financial worries, monetary commitments in Texas that could not be easily avoided, taxes owed on a move that occurred only 60 days prior, and most importantly, the concerns about the damage to her professional reputation.

63.    About two months later, Canyon Ranch ousted CEO Susan Docherty, its first and only woman CEO. In or about January 2020, Canyon Ranch replaced Docherty with a man.

64.     Canyon Ranch's pattern of favoring male employees in employment decisions did not end with the new CEO. In or about April 2020, Canyon Ranch terminated about 14 employees in what Norman claimed was an attempt to go "back to core values."[4] Thirteen of the fourteen impacted employees were women – many in revenue generating roles – and the company retained (or hired) men in those same or similar positions.

65.     In or about summer 2019, Canyon Ranch retained Ken Fine (male), via his agency, as the acting or interim Chief Marketing Officer. In or about December 2020, Canyon Ranch hired another man, Mike Fulkerson, as the Chief Marketing Officer. Canyon Ranch has not had a female senior leader with responsibility over the Marketing and Sales functions since Balabon's termination.

66.     It appears that after Docherty and Balabon Canyon Ranch's experiment with including women in leadership is over. Despite their qualifications, clear ability and work ethic, and their commitment to improving the company for its employees and clients, these women were unable to change the culture at Canyon Ranch so that it lives up to its professed mission and core values.

---

[4] *See* Pl.'s First Am. Petition, *Bruzzone v. CR Employment, Inc.*, No. 141-323386-21, in the 141st Judicial District Court, Tarrant County, Texas, at 2 (filed Feb. 11, 2021).

ORIGINAL COMPLAINT AND JURY DEMAND - 25

**F.     Balabon Complains of Sex Discrimination and Retaliation to Federal and State Enforcement Agencies**

67.     On or about February 27, 2020, Balabon filed a charge of sex discrimination and retaliation against defendants with the United State Equal Employment Opportunity Commission. The EEOC issued a notice of right to sue on or about April 6, 2021. More than 180 days have elapsed since she filed her charge. Balabon has exhausted all administrative prerequisites to filing suit under Title VII.

## V.     CAUSES OF ACTION

**COUNT 1:   SEX DISCRIMINATION – TITLE VII (42 U.S.C. §2000e-2)**

68.     Balabon incorporates by reference paragraphs 1 through 67.

69.     Congress enacted Title VII to "strike at the entire spectrum of disparate treatment of men and women in employment…." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). In passing Title VII, Congress declared that "sex… [is] not relevant to" employment decisions. *Price Waterhouse v. Hopkins*, 490 U.S. 288, 239 (1989). Consequently, Title VII makes it an unlawful employment practice for employers to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex…." 42 U.S.C. § 2000-e(2).

70.     Canyon Ranch's actions and omissions are an unlawful employment practice under 42 U.S.C. § 2000-e(2). In 1989, the Supreme Court recognized that "we [were] beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group…."

*Hopkins*, 490 U.S. at 251. Canyon Ranch terminated Balabon because of her sex while retaining male co-workers and subordinates, otherwise treated male co-workers and subordinates more favorably, and acted on impermissible sex bias and sex stereotypes.

### COUNT 2:   RETALIATION – TITLE VII (42 U.S.C. §2000e-3)

71.     Balabon incorporates by reference paragraphs 1 through 70.

72.     Congress aimed to secure Title VII's primary objectives "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance [the law's] basic guarantees." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006). Consequently, Title VII makes it an unlawful employment practice for employers to "discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000-e(3).

73.     Balabon repeatedly engaged in protected activity shortly before and leading to her termination. Balabon opposed sex discrimination and/or invidious gender stereotypes, supported other employees in their efforts to oppose sex discrimination, and escalated these concerns to the highest levels of the corporate structure.

74.     Canyon Ranch's actions and omissions, as described above, were an unlawful employment practice under 42 U.S.C. § 2000-e(3). Canyon Ranch

terminated Balabon because of protected activity while retaining male co-workers and subordinates, otherwise treated male co-workers and subordinates more favorably, and acted on impermissible sex bias and sex stereotypes. Rather than comply with its obligations to prevent and remedy sex discrimination, Canyon Ranch turned on Balabon, treated her less favorably than subordinate male employees and other similarly situated male employees, failed or refused to take seriously Balabon's and other employees' reports of sex discrimination, and ultimately ended Balabon's employment within weeks of her protected reports for a pretextual (and gender-biased) reason. Canyon Ranch would not have terminated Balabon when it did had she not opposed unlawful sex discrimination.

## DAMAGES AND OTHER REMEDIES

75. Balabon incorporates by reference paragraphs 1 through 74.

76. Canyon Ranch's discrimination and retaliation caused Balabon significant harm. Title VII entitles her to be made whole for this harm. She seeks equitable relief necessary to return her to the position that she would have held absent Canyon Ranch's unlawful conduct and to protect her and others from sex discrimination and retaliation.

77. Canyon Ranch's discrimination and retaliation caused Balabon to suffer—and she expects yet to suffer—pecuniary losses, including but not limited to, lost wages and other benefits associated with employment.

78. As a further result of Canyon Ranch's unlawful conduct, Balabon has suffered—and continues to suffer—non-pecuniary losses including, among others,

ORIGINAL COMPLAINT AND JURY DEMAND - 28

humiliation, damage to professional and personal reputation, undue stress, anxiety, mental distress and anguish, loss of enjoyment of life, and other non-pecuniary losses.

79.     Canyon Ranch acted with reckless indifference to Balabon's rights. Balabon therefore seeks punitive damages to deter Canyon Ranch and others from violating federal law.

80.     Canyon Ranch's unlawful conduct forced Balabon to retain counsel to redress the harms done. Consequently, Balabon seeks attorney's fees, expert costs, costs of suit, and other reasonable litigation expenses.

## CONDITIONS PRECEDENT

81.     Balabon exhausted available administrative remedies under Title VII. All conditions precedent to recovery on the claims asserted above have been performed, satisfied, met, and exhausted or have been waived.

## VI.     JURY DEMAND

82.     Balabon requests a jury trial on all issues triable of right to a jury.

## VII.     PRAYER FOR RELIEF

WHEREFORE, Balabon prays that CR Operating, LLC and CR Employment, Inc. be summoned to appear and answer, and that on final trial or summary disposition, the Court enter a judgment for Balabon against CR Operating, LLC and CR Employment, Inc. for the following:

a.     A declaration that defendants' actions violated federal law;

b.     Equitable relief necessary to permanently and forever prevent defendants and their officers, agents, servants, employees, and anyone in active concert or participation with them, from discriminating because of sex and/or retaliating because of protected activity, including but not limited to:

      (i)     an order that defendants implement and execute adequate policies, procedures, and programs to prevent and remedy sex discrimination and retaliation, and to eradicate the effects of their past unlawful employment practices;

      (ii)    an order that defendants implement adequate company-wide training on bias, stereotypes, and the importance both of effective investigations and internal accountability on reducing and preventing sex discrimination;

      (iii)   Court monitored evaluations of the adequate company-wide training programs and the effect of these programs on hiring, pay, and retention of women, including in company leadership;

      (iv)   Reinstatement to the position and seniority that Balabon would have held but for the discrimination and retaliation, and all other equitable relief necessary to restore her to the position that she would have held but for discrimination and/or retaliation; and front pay if this other equitable relief is not feasible; and

      (iv)   Other equitable relief necessary to bring defendants into and remain in compliance with the law.

c.     Back pay, including but not limited to lost wages and other employment benefits;

d.     Actual and compensatory damages;

e.     Punitive damages in an amount sufficient to punish defendants for their lawbreaking and to deter defendants and other employers from engaging in similar lawbreaking;

f.     Pre- and post-judgment interest;

g.     Attorney's fees, expert fees, costs of suit, and other reasonable litigation expenses; and

h.     All other legal and equitable relief to which Balabon is justly entitled.

1  DATED:  June __, 2021

Respectfully submitted,

PATRICIA E. RONAN LAW, LLC
P.O. Box 55341
Phoenix, AZ 85078
Tel:    619.458.2505

By: _____
    Patricia E. Ronan
    AZ Bar No. 029009
    patricia@ronanesq.com


GILLESPIE SANFORD LLP
4803 Gaston Ave.
Dallas, Texas 75246
Tel:    214.800.5111
Fax:    214.838.0001

By: _____
    James D. Sanford
    [*Application for Admission Pro Hac Vice Pending*]
    Texas Bar No. 24051289
    jim@gillespiesanford.com

ATTORNEYS FOR PLAINTIFFF